**C.P. BEDROCK, LLC, Petitioner–Appellee,**

v.

**DENVER COUNTY BOARD OF EQUALIZATION, Respondent–Appellant,**

and

**Board of Assessment Appeals, Appellee.**

No. 09CA2069.

Colorado Court of Appeals, Div. II.

April 14, 2011.

Certiorari Dismissed June 20, 2011.

Barry J. Goldstein, Denver, Colorado; Mark W. Gerganoff, Golden, Colorado, for Petitioner–Appellee.

David R. Fine, City Attorney, David V. Cooke, Assistant City Attorney, Denver, Colorado, for Respondent–Appellant.

John W. Suthers, Attorney General, Denver, Colorado, for Appellee.

Opinion by Judge FURMAN.

In this property tax case, the Denver County Board of Equalization (Denver) appeals a Board of Assessment (BAA) order that reclassified a parcel of real property (subject property) as agricultural for tax years 2007 and 2008. We reverse.

## I. The Subject Property

Relying on section 39–1–103(5)(c), C.R.S. 2010, Denver reclassified the subject property from agricultural to commercial vacant land in 2007. C.P. Bedrock, LLC (taxpayer), which owned the land, appealed this classification to the BAA.

The following facts are based on findings of the BAA and on undisputed evidence the parties presented at the hearing before the BAA.

The subject property consists of an approximately 37–acre parcel of vacant land that is zoned commercial mixed use and sits along Tower Road. It was acquired by taxpayer in 1998 as part of a 400–acre purchase and was leased for ranching. It was classified as agricultural through calendar year 2006.

In the fall of 2005, the City and County of Denver removed a fence on the subject property to widen Tower Road. After the fence was removed, ranching was no longer possible. Accordingly, taxpayer leased the property for farming to Wayne Miller, who was already farming other properties for taxpayer.

Miller leased 600 contiguous acres, including the subject property. Although the 600 acres contained parcels with various owners, Miller considered it to be one farm. The subject property formed the northeast corner of the 600 acres.

In 2006, various governmental entities began to work on the subject property as part of a cooperative effort to widen Tower Road. These entities included the Urban Drainage and Flood Control District, the Town Center Metropolitan District, and Denver Public Works.

In January 2006, construction workers managed by the Town Center Metropolitan District started an 80–foot–wide ditch construction project, which bisected the subject property from east to west, and they completed the project in August 2006. The workers used the entirety of the subject property during the project. On the northern sixty percent of the subject property, they parked the heavy equipment that they used to construct the ditch. On the southern forty percent of the subject property, where the ditch was located, they removed the topsoil and stored it in a mound. The construction workers did not replace the topsoil completely until the spring of 2007.

In 2006, Miller did not graze livestock or grow crops on the subject property, although he farmed other parcels. In 2007 and 2008, after the construction project was finished and the equipment had been removed, Miller grew millet and winter wheat on the subject property.

Beginning in 2001, Miller applied for his entire farm to be subject to a conservation plan pursuant to the Direct and Counter-Cyclical Program (DCP), which is administered by the United States Department of Agriculture. Miller did so in order to receive a wheat subsidy payment from the Adams County branch of the federal Farm Service Agency. Miller did not get approval for his farm to be in a DCP contract until 2003, when he started receiving subsidy payments.

Miller had to apply for the subject property's inclusion in his conservation plan so that he would not run afoul of regulations governing his DCP contract. He applied for the inclusion of the subject property in the conservation plan in January 2006. The relevant state and federal agencies, however, did not approve the inclusion of the subject property until March 2007.

At the BAA hearing, Miller testified that he did not perform any conservation practices on the subject property in 2006. He also admitted on cross-examination that he did not need to include the subject property in his base acreage for purposes of receiving his wheat subsidy pursuant to his DCP contract.

Section 39–1–102 (1.6)(a)(I), C.R.S.2010, defines "agricultural land" as a parcel of land "that was used the previous two years and presently is used as a farm or ranch ... or that is in the process of being restored through conservation practices."

The BAA found that "no farming or ranching activities occurred on the subject property during 2006." Nevertheless, and relying on *Douglas County Board of Equalization v. Clarke*, 921 P.2d 717 (Colo.1996), the BAA concluded that the lack of activities on the subject property in 2006 did not require its classification to be changed from agricultural land to commercial vacant land because "the subject property, while not farmed during 2006, [was] in fact a part of a larger farm unit which was actively farmed and enrolled in a government conservation program during 2006." The BAA therefore reversed Denver's reclassification and ordered Denver to restore the subject property's agricultural tax status for tax years 2007 and 2008 and to reduce the taxable value of the subject property from $4,031,600 to $3000.

On appeal, Denver challenges the BAA's conclusions and order.

## II. Standard of Review

 Subsections 24–4–106(7) and (11)(e), C.R.S.2010, require us to hold an agency action unlawful if the action is "otherwise contrary to law." "Although the interpretation of a statute by an agency charged with its administration, such as the BAA, is entitled to deference, a reviewing court is not bound by that interpretation where it is inconsistent with the clear language of the statute or with legislative intent." *Clarke*, 921 P.2d at 721. "The ultimate determination as to the appropriate classification of property for property tax purposes involves mixed issues of law and fact." *E.R. Southtech, Ltd. v. Arapahoe County Bd. of Equalization*, 972 P.2d 1057, 1059 (Colo.App.1998). If the BAA's classification determination has no reasonable basis in law, that determination must not be sustained. *See id.*

This case turns on the interpretation of section 39–1–102(1.6)(a)(I). "We interpret statutes de novo." *In re Estates of Nau v. State*, 183 P.3d 626, 629 (Colo.App.2007). "[W]e must first look to the plain language of the statute to determine its import." *Clarke*, 921 P.2d at 721. We also presume the legislature intended the statute to have a just and reasonable result. *Id.*

Denver contends that the BAA action was contrary to law because in 2006 the subject property was not used as agricultural land and, therefore, should not have received favorable tax treatment. We agree.

## III. Agricultural Land

 "Agricultural land in Colorado receives favorable *ad valorem* tax treatment, calculated on the basis of the earning or productive capacity of the land." *Id.* at 720; *see* Colo. Const. art. X, § 3; § 39–1–103(5)(a), C.R.S.2010. Therefore, classifying property as agricultural is a benefit that was "carved out to encourage and to protect ongoing agricultural use." *Clarke*, 921 P.2d at 720.

"Under the applicable statutory scheme, taxpayer [has] the burden of proof to show any qualifying uses of [its] land in the relevant years in support of [its] claims for agricultural classification." *Hepp v. Boulder County Assessor*, 113 P.3d 1268, 1270 (Colo.App.2005).

To be classified as agricultural for ad valorem tax purposes, therefore, taxpayer must prove that the subject property qualified as agricultural land either by (1) having been used the previous two years as, and presently being used as, a farm or ranch; or by (2) being in the process of being restored through conservation practices. *Clarke*, 921 P.2d at 721.

Denver contends the BAA erred in determining that the subject property met the definition of "agricultural land" because during 2006(1) neither taxpayer nor its lessee Miller used the subject property as a farm or ranch, and (2) the subject property was not in the process of being restored through conservation practices (meaning the subject property was not "part of a larger agricultural unit on which [farming] or conservation practices have occurred during the relevant tax years," *id.* at 724). We address each contention in turn.

### A. Use as a "Farm or Ranch"

In *Clarke*, the supreme court reviewed BAA conclusions that classified parcels of various cattle ranches as agricultural. *See id.* at 719–21. The supreme court considered whether section 39–1–102(1.6)(a)(I) (defining "agricultural land") and section 39–1–102(13.5), C.R.S.2010 (defining "ranch"), require that actual grazing take place in the tax year in question and in the prior two years. There was no actual grazing on the properties at issue in *Clarke* during the relevant time periods. *Clarke*, 921 P.2d at 719–20. The properties, however, were contiguous to other properties, which were owned by the same parties and on which actual grazing was taking place. *Id.*

The court reasoned that three questions arise when construing these statutes: (1) What is the meaning of "parcel"? (2) What is the meaning of "agricultural use"? and (3) What is the meaning of "conservation practices"? *Id.* at 720.

To answer the first question, the court held that the BAA must determine whether a parcel of land "is a segregated parcel that should be treated as a single unit; or whether it is part of an integrated larger parcel." *Id.* at 722. In making this determination, the BAA "should take into account the physical characteristics of the ... property" and "should also take into account the use of the property as it either integrates or conflicts with the use of the larger unit." *Id.*

To answer the second question, in the context of a "ranch" the court held that the BAA must determine that the land was actually used for grazing. *Id.* at 723. The court made allowances for the fact that "once animals are released into a pasture, they may not graze every acre of that pasture, through no fault of the landowner or lessee." *Id.* at 723 n. 11. Farming differs from ranching in that, because plants are not ambulatory, geography and contiguity are not relevant factors for crops as they would be for cattle. We conclude, however, that the ultimate question that the court posed in the context of ranching is the same in the context of farming: was the property at issue actually used by the landowner or lessee as a farm or part of a farm? *See id.* at 723.

The type of use necessary to qualify under the statute is "the actual surface use of the land," and this use "must be the focus of any classification of agricultural land for property tax assessment purposes." *Id.* In the context of farming, this means the property must be actually used "to produce agricultural products that originate from the land's productivity." § 39–1–102(3.5), C.R.S.2010 (defining "farm"). This use primarily includes active farming practices, like tillage, planting, and harvesting. It potentially could also include passive farming practices, like a crop rotation plan in which a portion of a farm is intentionally left fallow to protect the fertility of the soil. *See, e.g.,* 7 C.F.R. § 718.103(h)(1) (2006).

There was no actual farming on the subject property in 2006. Neither taxpayer nor Miller conducted active farming practices, such as tillage, planting, or harvesting.

Even taking passive farming practices, such as crop rotation, into account, the subject property was still not put to "agricultural use" in 2006. The subject property was not intentionally being left fallow as a part of a crop rotation plan, but was instead being occupied and used by the crew constructing the ditch. It cannot be argued that legitimate farming practices include disturbing forty percent of a farm's soil to construct a ditch while parking road construction equipment on the remaining sixty percent. On the contrary, the construction rendered the subject property unsuitable and unavailable for any farming practices during 2006, and the subject property simply could not function as a part of Miller's farm during that period.

We can therefore only conclude that the BAA's determination was based solely on the fact that the subject property was contiguous to Miller's farm and also leased by Miller. Contiguity, however, is not sufficient under *Clarke* and the statute at issue. *See Clarke,* 921 P.2d at 722. The *Clarke* court reasoned that the ranch property at issue must have been *both* "sufficiently connected to" other land *and* "connected by use with" other land to be classified as agricultural land. *Id.* The court's interpretation of the statute led to "the inescapable result" that a parcel of land must be used agriculturally "to qualify for agricultural classification." *Id.* at 722 n. 9.

Although Miller contemplated using the subject property as a part of his farm in the future when the construction equipment was removed and the soil was returned to its natural state, the supreme court in *Clarke* concluded that the "subjective intent" to put a property to an "agricultural use" in the future is irrelevant. *Id.* at 723. It is the actual use during the relevant period that is dispositive. In 2006, the actual use of the subject property was not as a farm, or as a part of a farm, but as a construction site.

The subject property was, therefore, not "a parcel of land ... that was used the previous two years and presently is used as a farm or ranch" under section 39–1–102(1.6)(a)(I). There was no "agricultural use of the subject property," taking into account both active and passive farming practices, during the relevant time period. Accordingly, the sub-

ject property did not qualify as "agricultural land" under the first criterion of section 39–1–102(1.6)(a)(I) during the relevant time period.

 We now turn to the third question in *Clarke,* and to the alternative ground relied on by the BAA—that the subject property qualified as "agricultural land" because it was "in the process of being restored through conservation practices." § 39–1–102(1.6)(a)(I).

### B. Conservation Practices

As it existed when the supreme court decided *Clarke,* section 39–1–102(1.6)(a)(I) did not define the phrase "in the process of being restored through conservation practices." The legislature, however, amended section 39–1–102(1.6)(a)(I) the year after *Clarke* was decided. *See* ch. 136, sec. 1, 1997 Colo. Sess. Laws 510. The relevant part of the current version of section 39–1–102(1.6)(a)(I) reads:

[A] parcel of land shall be "in the process of being restored through conservation practices" if: The land has been placed in a conservation reserve program established by the natural resources conservation service pursuant to 7 U.S.C. secs. 1 to 5506; or a conservation plan approved by the appropriate conservation district has been implemented for the land for up to a period of ten crop years as if the land has been placed in such a conservation reserve program.

 "[W]hen an amendment follows closely on a judicial decision interpreting a statute, and the plain meaning of the amendatory language manifests a modification of the statute as previously construed, we must assume that the General Assembly intended to change the law." *Barela v. Beye,* 916 P.2d 668, 676 (Colo.App.1996) (citing *Nelson, Haley, Patterson & Quirk, Inc. v. Garney Cos.,* 781 P.2d 153 (Colo.App.1989)); *see Union Pac. R.R. v. Martin,* 209 P.3d 185, 188–89 (Colo.2009). We therefore conclude that the definition of "conservation practices" in the amended statute is the current law.

Under the amended statute, a parcel may qualify as "being in the process of being restored through conservation practices" by

satisfying either of two separate conditions: The parcel may qualify (1) "if" the parcel "has been placed in a conservation reserve program" or (2) "if" it is subject to "a conservation plan approved by the appropriate conservation district ... for up to a period of ten crop years." § 39–1–102(1.6)(a)(I). We examine whether the taxpayer carried its burden of proof to show the subject property met either condition. *Hepp,* 113 P.3d at 1270.

Regarding the first condition, we note that neither the statute at issue nor the United States Code provisions cited in the statute define what it means to have "been placed" in a conservation reserve program.

The ordinary meaning of the verb "to place" is "to put in a particular position." *Webster's Third New International Dictionary* 1727 (2002); *see Harding v. Indus. Comm'n,* 183 Colo. 52, 59, 515 P.2d 95, 98 (1973)("words and phrases found in statutes are to be construed according to their familiar and generally accepted meaning").

The "particular position" required by section 39–1–102(1.6)(a)(I) is "in a conservation reserve program." This necessarily requires that the agency administering the conservation reserve program have approved the owner or lessee's application to the program at some point before or during the tax year in question. Until its approval, the application may still be rejected. In that case, the parcel's status would not satisfy this statute.

Our interpretation accords with the federal regulations regarding the Conservation Reserve Program, which signal generally, and sometimes state explicitly, that formal approval by the appropriate government agency is required for participation in the program. *See* Conservation Reserve Program Final Rule, 7 C.F.R. §§ 1410.1 to 1410.63 (2010) (final rule adopted May 14, 2004); Conservation Reserve Program Long–Term Policy, 69 Fed.Reg. 26755–01, 26755 (May 14, 2004) (codified at 7 C.F.R. pt. 1410).

Accordingly, we conclude that for a parcel to have "been placed in a conservation reserve program" for a certain tax year, the appropriate government agency must at least have approved the owner or lessee's applica-

tion for inclusion in the conservation reserve program at some point before the end of that tax year.

We next evaluate the subject property according to this construction of the first condition. In so doing, we assume without deciding that the conservation program at issue qualifies as a "conservation reserve program" under section 39–1–102(1.6)(a)(I).

It is undisputed that the government agencies in question did not approve Miller's application to add the subject property to the conservation program until 2007. Because the subject property was not placed in the conservation program in 2006, therefore, we conclude the property was not "being restored through conservation practices" under section 39–1–102(1.6)(a)(I).

The subject property also does not meet the second condition by virtue of being covered by "a conservation plan approved by the appropriate conservation district" which "has been implemented for the land for up to a period of ten crop years." § 39–1–102(1.6)(a)(I).

Prior to 2006, the subject property was used for grazing, and taxpayer did not show that the land was being conserved according to a plan approved by the conservation district. Further, taxpayer did not show that in 2006 the subject property was being preserved according to a conservation plan (because the land was being used as a construction site). There was effectively no conservation plan covering the subject property for 2006 or the years prior. The subject property, therefore, did not qualify by being subject to "a conservation plan approved by the appropriate conservation district ... for up to a period of ten crop years." *Id.*

For these reasons, we hold that the subject property does not qualify as "agricultural land" under section 39–1–102(1.6)(a)(I) by virtue of being "in the process of being restored through conservation practices." Thus, taxpayer cannot receive favorable tax treatment for the subject property for the 2007 and 2008 tax years on this basis.

### IV. Conclusion

Accordingly, the BAA's determination that Denver must reclassify the subject property as "agricultural land" had no reasonable basis in law and must be reversed. *See E.R. Southtech,* 972 P.2d at 1059. We decline taxpayer's invitation to decide this case on equitable principles, because "any agricultural classification for the subject parcels must be based on the foregoing statutory criteria rather than on any non-statutory equitable considerations," *Hepp,* 113 P.3d at 1270, and because the legislature has stated that the tax provisions at issue "shall be strictly construed." § 39–1–101, C.R.S.2010.

The order issued by the BAA to reclassify and revalue the subject property as agricultural land is reversed.

Judge CASEBOLT and Judge TERRY concur.